**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3437-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL LANGSTON,
a/k/a ROYCE WEAL,
MICHAEL LANGSTON, JR.,
ROYCE WEA JOHN DOE,
ROYCE AKA WEAL, and
ERIC SIMMONS,

    Defendant-Appellant.

_____

> Argued March 6, 2024 – Decided November 8, 2024
>
> Before Judges Accurso, Vernoia and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 20-01-0050.
>
> Nadine Kronis, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Nadine Kronis, of counsel and on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

Defendant Michael Langston appeals from his convictions for aggravated assault and possessory weapons offenses and aggregate sixteen-year sentence. He claims the court erred by allowing two witnesses to identify him at trial as the perpetrator of the offenses, failing to properly instruct the jury on the inherent unreliability of in-court identifications, depriving him of his right to confront witnesses against him, and imposing an excessive and otherwise incorrect sentence. Having considered the record, the parties' arguments, and the applicable legal principles, we affirm defendant's convictions, vacate his sentence, and remand for resentencing.

## I.

The charges against defendant arise out of an October 14, 2019 incident on State Street in the City of Camden. Although conflicting versions of what occurred were presented at trial, there is no dispute there was a physical altercation on the street during which Joe Carrillo was shot in the back. Carrillo later reported the shooter had also pointed a handgun at his cousin, Hassan

Payne. Defendant was at the scene of the altercation. When police arrived in response to a report of a shooting, defendant was present, injured, required medical attention, and was taken by police to the same hospital where Carrillo had been transported for the gunshot wound.

Within three hours of the shooting, police had identified defendant as the suspected shooter and conducted separate photo-array identification procedures with Carrillo and Carrillo's girlfriend's son, Naim Jackson, who had also been present during the incident. Carrillo's identification procedure took place at the hospital. Jackson's identification procedure took place at the Camden Police Department Administration building.

Different detectives, neither of whom had knowledge of the investigation or defendant's identification as a suspect, conducted the procedures. During the separate procedures, Carrillo and Jackson each selected defendant's photograph from the arrays and identified him as the shooter. The documents associated with the presentation of the arrays reflect the identification procedures had been recorded, but the State was later unable to locate the recordings.

A grand jury returned an indictment against defendant charging him with: second-degree aggravated assault of Carrillo, N.J.S.A. 2C:12-1(b)(1) (count one); fourth-degree aggravated assault of Carrillo by pointing a handgun at him,

3

N.J.S.A. 2C:12-1(b)(4) (count two); fourth-degree aggravated assault of Hassan Payne by pointing a handgun at him, N.J.S.A. 2C:12-1(b)(4) (count three); possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four); unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count five); unlawful possession of hollow-point bullets, N.J.S.A. 2C:39-3(f)(1) (count six); third-degree receiving stolen property, a handgun, N.J.S.A. 2C:21-7(a); and second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1).

Prior to trial, defendant moved to suppress Carrillo's and Jackson's out-of-court identifications during the photo-array procedures on the day of the shooting. The court conducted a Wade/Henderson[1] hearing on the motion. Camden County Police Department Detective Brian Ford testified about his administration of the photo-array to Jackson, Carrillo testified concerning the photo-array identification procedure that had been administered to him; and Camden County Police Department Detective Andrew Einstein testified about his involvement in the investigation of the shooting, his assembly of the photographs for inclusion in the separate photo arrays, and his interactions with

_____

[1] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011). A Wade-Henderson hearing is a pretrial hearing at which the court assesses the reliability of eyewitness identification procedures to determine the admissibility of a witness's identification of a defendant. See generally Henderson, 208 N.J. at 288-96.

the detectives who had conducted the photo-array identification procedures with Carrillo and Jackson.

Carrillo testified he had seen the person—defendant—who had shot him prior to the incident on numerous occasions. More particularly, he explained he had seen defendant walking past his home "every other day" and previously had said "hi or whatever" to defendant as he had passed by. Carrillo testified he had seen defendant "over [thirty]" times prior to the incident.

The prosecutor asked Carrillo if he saw in the courtroom "the person who [had] shot him . . . ?" Defendant did not object to the question. Carrillo responded in the affirmative, and the prosecutor asked, without objection, if Carrillo could point out the person and describe what the person was wearing. Carrillo then made an in-court identification of defendant, pointing at defendant and describing what he wore.

Following the presentation of the testimony and after hearing argument, the court reserved decision and later rendered a detailed and thorough opinion from the bench. After briefly describing the circumstances giving rise to the shooting, the court noted defendant had satisfied the threshold for a hearing on the admissibility of the out-of-court identifications because the State was unable to locate the recordings of the photo-array identification procedures, see State

v. Anthony, 237 N.J. 213, 228-29 (2019), and that defendant therefore bore the burden of demonstrating a very substantial likelihood of irreparable misidentification to bar admission of the identification under the standard directed by our Supreme Court in Henderson, 208 N.J. at 289.

The court then summarized the testimony of the witnesses presented and found each to be credible. The court found the State had established there had been no flaws in the system variables pertinent to a determination of whether the photo-array procedures had been suggestive. See id. at 289-90. The court concluded the evidence demonstrated "two properly administered arrays" and "absolutely no misconduct on the part of law enforcement." The court further found the out-of-court identifications were the product of "[e]ight randomly sequenced photos that were in two arrays that were administered by detectives not involved in the investigation." The court further observed that Carrillo and Jackson had not been told that defendant was included in the arrays "nor influenced in their selection of the photos identifying defendant."

The court further addressed the estimator variables pertinent to a determination of the reliability of an identification procedure under Henderson. Id. at 291-92. The court made findings as to the estimator variables and concluded "on both a qualitative and quantitative basis, the[] factors ultimately

A-3437-21

weigh heav[ily] in favor of [the] reliability" of the out-of-court identifications. The court concluded that defendant therefore had failed to prove even a "likelihood of irreparable misidentification, let alone a substantial likelihood of one" that is required under Henderson. Id. at 289. The court denied defendant's suppression motion and the matter proceeded to trial.

Carrillo testified at trial that on October 14, 2019, he had been sitting on the porch of his State Street home with his fiancée and his cousin, Hasan Payne. He had seen "[a] group of guys walking up the street," "starting trouble with people." More particularly, Carrillo testified a group of "about five" guys had approached his neighbor, whom he knew as "Boo-Boo," as if they were going to "jump" him. Payne then followed the group up the street to prevent them from "jump[ing]" Boo-Boo, and when Payne returned, the same group had followed and then surrounded him.

According to Carrillo, during an ensuing physical altercation between the members of the group, and him and Jackson, he observed a "guy pull a gun out" from his hoodie and point it at Payne. Carrillo testified he believed Payne's "life was in danger," so he "spinned" [sic], "took the bullet" in his back and simultaneously "punched the [shooter] and knocked him out."

7

When asked for clarification, Carrillo explained he had spun around and had been shot in the back while punching and knocking out the shooter. He also explained that after he had been shot, he "had two of [his] neighbors put" the revolver that had been used to shoot him "in the flowerpot to give it to the police." Carrillo also testified the shooter—defendant—remained unconscious until police arrived at the scene and transported defendant to the same hospital at which he was treated for the gunshot wound.

At trial, the State did not ask Carrillo about his prior identification of defendant during the photo-array identification procedure that had been the subject of the Wade/Henderson hearing. And he did not otherwise mention the procedure or that prior identification of defendant. The prosecutor instead asked Carrillo if he saw the person who had shot him "in the courtroom today?" Carrillo replied in the affirmative and identified defendant by pointing at him. Defendant did not object to the prosecutor's question or to Carrillo's in-court identification.

Jackson testified at trial that he is the son of Carrillo's fiancée and lived with his mother and two sisters, Carrillo, and Payne on State Street. He further testified he had been present when the shooting occurred. Jackson explained that a group had surrounded Payne, a fight ensued, and he and Carrillo had

8

"stepped into it." He testified that a man wearing a blue hoodie shot Carrillo and the shooter's face "was messed up" and bleeding after the fight. Jackson testified he had seen the gun "[f]or a quick moment" and the shooter had held it in his right hand. He also testified, "I saw him pull out the gun and shoot" Carrillo.

When asked if he saw in the courtroom the person who had fired the shot, Jackson without objection responded in the affirmative. Asked to point out the person who had fired the shot, Jackson made an in-court identification of defendant, again without objection.

On cross-examination, defense counsel asked Jackson what "observations" he had made of the shooter's face. Jackson said he could not remember. Defense counsel also asked Jackson about a statement he had provided to Detective Einstein about the incident, suggesting Jackson had told the detective he had not seen defendant's face at the time of the shooting. Jackson replied that he did not recall saying that to the detective and testified he "did see [defendant's] face" during the shooting. Detective Einstein was not called to testify at trial and the purported statement referred to by defense counsel during cross-examination was not admitted in evidence.

9

Former Camden County Police Department Officer Robert Stires testified that on October 14, 2019, he was dispatched to State Street and when he arrived at the scene there was "commotion everywhere" and an "unidentified woman" "flagged [him] down" saying "the gun's over here" while pointing to a flowerpot. Officer Stires "took the firearm" back to his patrol car and "emptied out the ammunition . . . and [a] spent shell casing." He then returned to the scene to see if anyone had been injured. Seeing that an individual had been shot, he transported the injured person, who other evidence established was Carrillo, to the hospital.

The State also presented evidence that the police had collected defendant's clothing after transporting him to the hospital. The right sleeve of a long-sleeved shirt defendant had worn later tested positive for gunshot residue.

The State also presented evidence that the gun that had been recovered from the flowerpot contained one discharged round of ammunition and other live rounds of ammunition. In addition, the State presented evidence that the surface of the gun, including its handle, barrel, and trigger had been swabbed for DNA.

Forensic scientist Katheryne Meakim testified defendant was the source of DNA that had been recovered from the gun. When asked for clarification

about what she had meant in stating defendant was the "the source" of the DNA, Meakim testified:

> The source is our threshold of identity. When we're willing to say it is the source, we feel the profile is rare enough that we don't expect anyone else in the population to have the same profile. Studies have been done to determine that threshold. World population is about [seven] billion, so the threshold is set at [seven] trillion. So, statistically, we would need the population of a thousand earths to be able to expect to see this DNA profile to occur a second time.

Defendant called his son, Rayquan Morton, as a witness. Morton testified he had asked his father to walk with him down State Street because defendant had feared Morton would be jumped. Morton explained that as they walked past Carrillo and others, a fight started. According to Morton, while "everybody was fightin[g,]" "a baldheaded guy with glasses on" went into a house, returned to a porch, and shot at him. He testified he saw another person "trying to shoot" and had heard two shots fired by the bald man, one of which grazed him as he fled the scene on foot. Morton testified that he was wearing a blue coat but could not remember what his father had worn that day. Morton therefore acknowledged that defendant was present at the scene and participated in the fight during which Carrillo had been shot.

The jury convicted defendant of second-degree aggravated assault on Carillo (count one) but found defendant not guilty of fourth-degree aggravated assault by pointing a handgun at Carrillo (count two). The jury found defendant guilty of aggravated assault by pointing a handgun at Payne (count three), possession of a weapon for an unlawful purpose (count four), unlawful possession of a weapon (count five), and, following a separate trial, certain persons not to possess a weapon (count eight). The jury found defendant not guilty of unlawful possession of hollow-nose bullets (count six). At the State's request the court had dismissed count seven, receiving stolen property, during trial.

At sentencing, the court found aggravating factors three, the risk that defendant will re-offend, N.J.S.A. 2C:44-1(a)(3); six, the extent and seriousness of defendant's offense history, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The court found mitigating factor eight, defendant's conduct was the result of circumstances unlikely to reoccur, N.J.S.A. 2C:44-1(b)(8). The court denied the State's motion to impose an extended term pursuant to N.J.S.A. 2C:44-3, even though defendant otherwise qualified as a persistent offender under subsection (a) of the statute.

12

The court merged defendant's conviction for fourth-degree aggravated assault by pointing a handgun at Payne (count three) with his conviction for second-degree aggravated assault on Carrillo (count one) and imposed on count one an eight-year sentence subject to the requirements of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court also merged count five, charging unlawful possession of a weapon, with count four, charging possession of a weapon for an unlawful purpose, and imposed an eight-year sentence on count four subject to the requirements of the Graves Act, N.J.S.A. 2C:43-6. The court also imposed an eight-year sentence subject to the requirements of the Graves Act on count eight, charging certain persons not to possess a weapon, to run concurrent to the sentence imposed on count four. The court further directed that the eight-year sentence on count one would be served consecutively to the concurrent sentences imposed on counts four and eight.

In sum, the court imposed an aggregate sixteen-year sentence, half of which is subject to the Graves Act and the other half of which is subject to NERA. This appeal followed.

Defendant presents the following points for our consideration:

POINT I

ALTHOUGH THE KEY ISSUE AT TRIAL WAS IDENTITY, THE TRIAL COURT IMPROPERLY

13                                    A-3437-21

PERMITTED CARRILLO'S AND JACKSON'S IN-COURT IDENTIFICATIONS AND FAILED TO INSTRUCT THE JURY ON THE INHERENT UNRELIABILITY OF IN-COURT IDENTIFICATIONS.

A. The Wade[-Henderson] Hearing[.]

B. Carrillo's in-court identification was inadmissible.

C. The State presented no evidence of Naim Jackson's ability to observe the shooter at the Wade[-Henderson] hearing, and his trial testimony revealed he did not recall the shooter's face; therefore, Jackson's in-court identification was not based on his memory of the incident and was thus inadmissible.

D. The court's failure to give jurors the tools to assess the reliability of the in-court identifications and to specifically caution them regarding the inherent suggestiveness of in-court identifications was plain error.

E. In a weak case in which the only issue was identity, the wrongful admission of the identifications and the inadequate jury instructions were reversible error, individually and cumulatively.

POINT II

[OFFICER] ARTHUR'S TESTIMONY THAT WHEN HE ARRIVED ON THE SCENE, A "LARGE CROWD" OF PEOPLE — NONE OF WHOM TESTIFIED AT TRIAL — WERE BEATING THE DEFENDANT AND SHOUTING THAT HE WAS THE SHOOTER WAS A CLEAR VIOLATION OF HIS CONFRONTATION CLAUSE RIGHTS, REQUIRING REVERSAL.

14

POINT III

THE PROSECUTOR MISLED THE JURY BY MISCHARACTERIZING COMPLEX DNA EVIDENCE CENTRAL TO THE STATE'S CASE AND MADE INFLAMMATORY STATEMENTS IN SUMMATION, DEPRIVING [DEFENDANT] OF A FAIR TRIAL.

A. [Defendant]'s convictions must be reversed because the prosecutor unfairly bolstered the State's case by severely mischaracterizing the DNA evidence.

B. The prosecutor's inflammatory valorization of the police, the victim, and his own office deprived [defendant] of a fair trial.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS ABOVE WARRANTS REVERSAL.

POINT V

REMAND FOR RESENTENCING IS REQUIRED.

A. The trial court erred by failing to merge aggravated assault (Count 1) with possession of a weapon for an unlawful purpose (Count 4) where the only unlawful purpose charged was aggravated assault.

B. The court erred by imposing a consecutive sentence for possessing the weapon used to commit aggravated assault.

C. The court failed to properly identify and weigh the aggravating and mitigating factors.

15

Defendant raises the following additional points in his reply brief:

POINT I

DESPITE THE STATE'S CLAIM TO THE CONTRARY, JOE CARRILLO'S IN-COURT AND OUT-OF-COURT IDENTIFICATIONS WERE BOTH CHALLENGED.

POINT II

THERE WAS A VERY HIGH RISK THAT THE TWO UNRELIABLE IDENTIFICATION PROCEDURES TAINTED CARRILLO'S IN-COURT IDENTIFICATION, AND THAT IT LACKED ANY INDEPENDENT BASIS IN CARRILLO'S MEMORY OF THE INCIDENT.

A. Both the unreliable photo array and the show-up identification procedure at the Wade[-Henderson] hearing tainted Carrillo's in-court identification.

B. State v. Watson[2] and State v. Burney[3] make clear that Carrillo's passing familiarity with [defendant] is not an independent basis for Carrillo's in-court identification, and neither Carrillo nor Jackson had an adequate opportunity to view the shooter prior to the shooting[.]

POINT III

THE STATE DID NOT MEET ITS BURDEN OF DEMONSTRATING THAT THE ANONYMOUS CROWD'S STATEMENT INCRIMINATING

[2] State v. Watson, 254 N.J. 558 (2023).

[3] State v. Burney, 255 N.J. 1 (2023).

16

[DEFENDANT] WAS AN EXCITED UTTERANCE, THE TESTIMONIAL STATEMENT VIOLATED [DEFENDANT]'S CONFRONTATION CLAUSE RIGHTS, AND THE TRIAL COURT'S FAILURE TO STRIKE IT FROM THE RECORD REQUIRES REVERSAL.

POINT IV

THE COURT APPROPRIATELY MERGED [DEFENDANT]'S CONVICTIONS ON COUNTS ONE AND THREE.

II.

Defendant argues that Carrillo's and Jackson's in-court identifications of defendant were improperly admitted at trial. Defendant contends the court first erred by determining at the Wade/Henderson hearing that Carrillo's and Jackson's out-of-court identifications during their respective photo-array procedures were admissible at trial. For the first time on appeal, he contends the photo-array procedures had impermissibly tainted Carrillo's and Jackson's in-court identifications of defendant at trial, Carrillo's in-court identification during the Wade/Henderson hearing constituted an impermissible show-up identification procedure that tainted his later in-court identification of defendant at trial, Carrillo's and Jackson's in-court identifications of defendant at trial constituted unduly suggestive identification procedures, and the court failed to

A-3437-21

adequately instruct the jury on how to assess the trustworthiness of the two in-court identifications at trial.

As we have explained, although the court had determined following the Wade/Henderson hearing that evidence concerning Carrillo's and Jackson's out-of-court identifications of defendant during their respective photo-array identification procedures was admissible at trial, the State did not present evidence of those identifications at trial. Defendant nonetheless challenges the court's ruling that those out-of-court identifications were admissible because he otherwise argues they tainted Carrillo's and Jackson's in-court identifications and, for that reason, the in-court identifications at trial had been improperly admitted.

We consider on appeal a court's order admitting an out-of-court identification in the same manner we "review a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016). Factual findings are accorded deference because they "are substantially influenced by [the trial court's] opportunity to hear and see the witnesses and to have the 'feel of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). A trial court's determination that an identification procedure was reliable should not be

disturbed as long as it is supported by sufficient credible evidence. State v. Adams, 194 N.J. 186, 203 (2008); State v. Locurto, 157 N.J. 463, 470-71 (1999). Our review of a court's legal conclusions and application of the facts to the law is de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

We are not persuaded by defendant's claim the court erred in the first instance by determining at the Wade/Henderson hearing that Carrillo's and Jackson's out-of-court identification of defendant during their respective photo-array procedures were admissible. To obtain a pretrial hearing challenging an out-of-court identification, a defendant "has the initial burden of showing some evidence of suggestiveness that could lead to mistaken identification." Henderson, 208 N.J. at 288. The court determined that burden had been satisfied because the State was unable to locate the recordings of the photo-array proceeding. See Anthony, 237 N.J. at 233-34 (holding a defendant is entitled to a Wade/Henderson hearing if no electronic or contemporaneous, verbatim recording of an identification procedure was made or provided).

At the hearing, the State was required "to offer proof to show that the proffered eyewitness identification[s]" were "reliable—accounting for system and estimator variables—subject to the" caveat that the court could have "end[ed] the hearing at any time if it [had found] from the testimony that

defendant's threshold allegation of suggestiveness [was] groundless." Henderson, 208 N.J. at 289. To obtain an order barring admission of the out-of-court identifications obtain during the photo-array procedures, defendant bore the "ultimate burden" of "prov[ing] a very substantial likelihood of irreparable misidentification." Ibid.

In support of his assertion the court erred by determining Carrillo's and Jackson's out-of-court identifications were admissible, defendant claims the evidence showed Carrillo's identification during the photo-array procedure was unreliable because he was in the hospital and in and out of consciousness at the time. To be sure, there was testimony that Carrillo was in the hospital, had received medications, and had at times lost consciousness after he was shot, but Carrillo otherwise testified he was conscious when he viewed the photo-array, had read and signed the photo-array procedure form he had been provided by the police, and had selected defendant's photo and identified defendant as the shooter.

The court considered the evidence presented, determined Carillo was credible, and accepted his version of the manner in which he had been presented with the photo array, had selected defendant's photograph, and had identified defendant as the shooter. Although defendant points to evidence he contends

undermines the court's findings, we are satisfied court's findings of fact are amply supported by sufficient evidence the court deemed credible. We therefore affirm the court's order denying defendant's motion to suppress Carrillo's out-of-court identification.

We also affirm the court's denial of defendant's motion to suppress Carrillo's out-of-court identification for two separate but equally dispositive reasons. First, defendant fails to point to any evidence presented at the Wade/Henderson hearing that is sufficient to satisfy his ultimate burden of proving a "very substantial likelihood of irreparable misidentification." Ibid. That failure alone required the denial of his suppression motion. Ibid.

Second, Carrillo's out-of-court identification of defendant during the photo-array procedure, conducted within hours of the shooting, constituted a "confirmatory" identification procedure that "is not considered suggestive." State v. Pressley, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." Id. at 592-93. The Court has explained that the person identified "may be a neighbor or someone known only by a street name," id. at 593, and that is precisely what occurred here. Carrillo testified he had seen defendant more than thirty-times in their neighborhood and had said "hi" to him

21

on prior occasions. Thus, the court correctly denied defendant's suppression motion for the independent reason that the photo-array procedure involved a confirmatory identification of defendant, id. at 592-93, and defendant otherwise therefore could not, and did not, establish the "very likely likelihood of irreparable misidentification" required to support the requested suppression of Carrillo's out-of-court identification during the photo-array procedure. Henderson, 208 N.J. at 289.

Defendant similarly argues the court erred by denying his motion to suppress Jackson's out-of-court identification during the photo-array procedure. The court relied on Detective Ford's testimony describing the manner in which he had administered the photo-array procedure, addressed the Henderson factors based on the totality of the circumstances presented, and found no evidence of suggestiveness in the identification process.[4] Again, we defer to the court's

[4] We reject defendant's claim the court "conflated" the estimator variables in its analysis of his motion to suppress Jackson's out-of-court identification at the Wade/Henderson hearing by a failing to make a separate findings concerning those factors for purposes of considering defendant's requests to suppress Carrillo's and Jackson's out-of-court identifications. Based on the circumstances presented, and because the unrefuted evidence established that Carrillo and Jackson were present at the identical time, in the same place, and while involved in the same physical altercation during which defendant allegedly pointed the gun at Payne and shot Carrillo, we find no error in the court's findings, all of which are supported by substantial credible evidence, of the estimator factors

findings of fact supporting its determination there was no evidence of suggestiveness because those findings are supported by sufficient evidence the court found credible. Moreover, defendant again fails to point to any evidence presented during the Wade/Henderson hearing satisfying his burden of establishing the "very substantial likelihood of irreparable misidentification" that is required for suppression of an out-of-court identification under Henderson. Ibid. We therefore affirm the court's order denying defendant's motion to suppress Jackson's out-of-court identification of defendant.

Defendant contends the evidence at trial established there is a very substantial likelihood of irreparable misidentification in Jackson's out-of-court identification during the photo-array procedure, and in-court identification at trial, because there was evidence at trial establishing Jackson did not see defendant when he pointed the gun at Payne and shot Carrillo. Defendant argues that in a statement Jackson had provided police following the shooting, he said he had seen the gun but had not seen the face of the shooter. Defendant therefore contends Jackson's statement to the police establishes his out-of-court

that applied equally to Carrillo and Jackson. Under those circumstances, the mere fact that the court addressed, assessed, and found the estimator factors that were common to Carrillo's and Jackson's separate identifications does not make the court findings incorrect.

23

identification during the photo-array procedure and his in-court identification at trial must have been the product of improper suggestiveness sufficient to demonstrate a very substantial likelihood of irreparable misidentification.

Defendant's argument finds no support in any competent evidence. Jackson's purported statement to the police—which defendant claims establishes Jackson had told the police he never saw the shooter's face—was never admitted in evidence at the Wade/Henderson hearing or at trial. Thus, there is no evidence Jackson ever made the statement about not seeing the shooters face upon which defendant's argument solely relies.

During cross-examination, defense counsel referred to the purported statement, and asked Jackson if he had said "no" to the police when asked if he had seen the shooter's face "at all." Defendant's response was "I don't recall that. I did see his face." No record of the Jackson's putative prior statement was introduced in evidence, and the purported facts woven into defense counsel's question do not constitute evidence. There is no admission by Jackson that he had previously informed the police he did not see the shooter's face, and the only competent evidence concerning whether Jackson had seen the shooter's face was his affirmative testimony that he had. Thus, defendant's claim the trial evidence established Jackson said he had never seen the shooter's face and, for that reason,

his out-of-court and in-court identification of defendant was the product of "a substantial likelihood of irreparable misidentification" finds no evidential support in the record.

Defendant also argues that: Carrillo's in-court identification of defendant at the <u>Wade/Henderson</u> hearing constituted an unduly suggestive identification procedure and the procedure tainted Carrillo's subsequent in-court identification of defendant at trial; Carrillo's in-court identification of defendant at trial constituted a separate unduly suggestive identification procedure; and Jackson's in-court identification of defendant at trial separately constituted an unduly suggestive identification procedure that had further been tainted by his participation in what defendant claims was Jackson's participation in the unduly suggestive prior photo-array identification procedure. We are not persuaded.

In the first instance, although defendant's initial motion to suppress Carrillo's and Jackson's out-of-court identifications during their separate photo-array procedures also sought suppression of Carrillo's and Jackson's anticipated in-court identifications of defendant, the requested suppression of the anticipated in-court identifications in that motion was based solely on the claim that the out-of-court photo-array identification procedures were unduly suggestive. As we have explained, we reject that argument for same reason as

the motion court—at the Wade/Henderson hearing defendant failed to carry his burden of establishing "a very substantial likelihood of irreparable misidentification," Henderson, 208 N.J. at 289, during the photo-array identification procedures and, as a result, based on the arguments defendant had presented to the trial court, there were no grounds permitting or requiring the suppression of both the out-of-court photo-array identifications and the anticipated in-court—at trial—identifications.

On appeal, defendant presents different arguments based on different circumstances he never presented to the trial court. He contends the in-court identifications were improperly admitted at trial not only because the court erred by denying the prior suppression motion, but also because the process by which Carrillo made the in-court identification at the Wade/Henderson hearing constituted a distinct impermissibly suggestive identification procedure that also tainted Carrillo's subsequent in-court identification at trial. Defendant also argues for the first time that the process—the State's requests that they identify in court the person who had shot Carrillo—by which Carrillo and Jackson made their identifications at trial also constituted purported impermissibly suggestive identification procedures that should not have been permitted at trial.

Defendant did not object during the Wade/Henderson hearing to the State's request that Carrillo identify the person who had shot him. Defendant did not argue that in making the request, the State had engaged in an impermissibly suggestive identification procedure that would taint all future identifications by Carrillo of the individual who had fired a bullet into his back.

Defendant also did not object at trial to the State asking Carrillo and Jackson if they saw the shooter in the courtroom and requesting they identify the shooter if they saw the person in the courtroom. Defendant further did not object to Carrillo's and Jackson's responses to the State's inquiries and requests by identifying defendant as the shooter. Defendant did not move before the trial court to exclude the identifications based on any claim—like the one he makes now for the first time on appeal—that asking the witnesses to identify the shooter in the courtroom during trial constituted an impermissibly suggestive identification procedure.[5]

_____

[5] We observe that Carrillo's and Jackson's in-court identifications of defendant at trial did not constitute "first-time identifications" of defendant. Watson, 254 N.J. at 587-89. As noted, Carrillo and Jackson had separately identified defendant within a few hours of the shooting during their respective photo-array identification procedures, and Carrillo had also identified defendant without objection during the Wade/Henderson hearing. We also note that Carrillo's identification of defendant constituted a "confirmatory identification" because he knew defendant from seeing him in their neighborhood, greeting him on

Although we may consider allegations of error not brought to the trial judge's attention, we need not do so. Generally, we will not consider such issues, even if of constitutional dimension, unless they go to the jurisdiction of the trial court or concern matters of substantial public interest. State v. Vicenty, 237 N.J. 122, 135 (2019); State v. Galicia, 210 N.J. 364, 383 (2012); State v. Robinson, 200 N.J. 1, 20-22 (2009); State v. Arthur, 184 N.J. 307, 327 (2005); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

Defendant's newly minted arguments do not go to the jurisdiction of the trial court or concern matters of substantial public interest. And defendant's failure to raise before the trial court his new claims that Carrillo's in-court identification of defendant at the Wade/Henderson hearing tainted his later in-court identification of defendant and the identifications of defendant made by Carrillo and Jackson at trial were the product of an unduly suggestive in-court identification procedures, deprived the trial court "of an opportunity to take

occasion, and seeing him more than thirty-times prior to the shooting. Moreover, although identification of defendant was a central issue at trial, the State's proof defendant was the shooter was not dependent on Carrillo's and Jackson's in-court identifications. The State's evidence otherwise established defendant's DNA was found on the gun used during the shooting, a long-sleeve shirt taken from defendant following the shooting had gun-shot residue on its right sleeve, and the evidence otherwise established the shooter had held the gun in his right hand. Additionally, defendant was found by the police at the scene suffering from injuries.

28

curative action," see State v. Frost, 158 N.J. 76, 84 (1999), and to develop the record necessary to allow it to address those claims, see, e.g., State v. Washington, 256 N.J. 136, 166 (2024) (explaining "defendants may seek a pretrial hearing to determine whether a witness's identification evidence will be admitted at trial"); Watson, 254 N.J. at 588 (explaining "if a hearing is needed to determine admissibility" of a first-time in-court identification of a defendant, the hearing "should be conducted and resolved before the start of trial"). We are therefore without the necessary record on which defendant's new claims may be properly considered for the first time on appeal. For those reason, we decline to address the merits of defendant's arguments that are raised for the first time here.[6] Vincenty, 237 N.J. at 135; Robinson, 200 N.J. at 20-22.

We also reject defendant's claim the court erred by failing to instruct the jury on the alleged inherent suggestiveness of in-court identifications.

---

[6] Although unnecessary to our decision not to address the merits of defendant's newly asserted claims, we are not persuaded admission of the in-court identifications at trial were clearly capable of producing an unjust result. R. 2:10-2. For the reasons already expressed, Carrillo's and Jackson's in-court identifications of defendant at trial did not constitute "first-time identifications," see generally Watson, 254 N.J. at 583-89, Carrillo's identification of defendant constituted a "confirmatory identification," see Pressley, 232 N.J. at 592-93, and defendant's identification as the shooter was otherwise separately established through the DNA and gun-shot-residue evidence and defendant's undisputed presence at the scene of the shooting.

Defendant did not object at trial to the court's jury instructions or request that the court include the charge he now contends the court should have provided. We therefore review defendant's arguments under the plain error standard. State v. Cooper, 256 N.J. 593, 607 (2024).

"Regarding a jury instruction, 'plain error requires demonstration of '"legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."'" State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). We find no such error here.

Although "[a] trial court has an 'independent duty to . . . ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party," Cooper, 256 N.J. at 608 (quoting State v. Reddish, 181 N.J. 553, 613 (2004)), defendant ignores that he did not argue before the trial court or jury that Carrillo's in-court identification during the Wade/Henderson hearing tainted his in-court identification at trial or that Carrillo's and Jackson's in-court identifications at trial were the product of purported unduly-suggestive trial

procedures. Thus, defendant offered no basis at trial to support or require a jury instruction on the alleged taint created by Carrillo's in-court identification during the Wade/Henderson hearing or the alleged suggestiveness of the in-court trial identifications. The court therefore had no reason based on the record before it to instruct the jury in the manner defendant now claims the court should have.

We also reject defendant's challenge to the jury instructions because his failure to object at trial supports a presumption "that the charge was not error and was unlikely to prejudice . . . defendant's case." Montalvo, 229 N.J. at 320 (quoting State v. Singleton, 211 N.J. 157, 182 (2012)). We also find no evidence the court's instruction on identification, provided in strict accordance with Henderson's requirements as set forth in the model jury charge, Model Jury Charges (Criminal), "Identification: In-Court Identification Only" (Rev. July 19, 2012), was insufficient or inadequate to properly advise the jury as to the manner in which it should assess the identification evidence presented based on the issues surrounding identification presented by the parties during the trial.

We further note the State did not present any evidence at trial that Carrillo and Jackson had previously identified defendant in the out-of-court photo-array procedures or that Carrillo had identified defendant during the Wade/Henderson

A-3437-21

hearing. Defendant also did not present any evidence concerning those identifications, mention them during cross-examination of the State's witness, or make arguments based on them during summation. Of course, to have done so would have resulted in the presentation of evidence that Carrillo and Jackson had separately identified defendant as the shooter within a short-time of the incident, and that evidence would have further supported the State's case.

Because there was no evidence presented at trial concerning Carrillo's and Jackson's prior identifications of defendant as the shooter, defendant's argument that the court erred by failing to instruct the jury about the purported taint those identifications allegedly had on the in-court trial identifications is undermined by the record. Most simply stated, the trial record lacked any evidence supporting that instruction because there was no evidence presented concerning those prior identifications.

Carrillo's and Jackson's in-court trial identifications were the only identifications of defendant before the jury, and the court instructed the jury without objection as to the manner in which those identifications should be considered. Because defendant had not argued that those identifications resulted from unduly suggestive identification procedures, and because there was no evidence concerning the prior identifications made by Carrillo and Jackson, the

32

court was without any basis in the record to stray from the model jury instruction on in-court identifications for the purpose of addressing issues never raised by the parties. See generally State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) ("[A] jury charge is presumed to be proper when it tracks the model charge because the process to adopt model jury charges is 'comprehensive and thorough.'" (quoting State v. R.B., 183 N.J. 308, 325 (2005))). We therefore reject defendant's claim he is entitled to reversal of his convictions based on any alleged error in the court's instruction to the jury on identification.

III.

Defendant also argues that his convictions must be reversed because his right to confront witnesses against him was violated at trial during testimony presented by Camden County Metro Police Department Officer Christopher Arther. Officer Arthur testified that he had responded to the report of a fire near the incident in which Carrillo was shot and then responded to the nearby scene of the shooting. He testified that when he arrived at the scene of the shooting, he observed a "large crowd" fighting that included a group of individuals "beating on a male who was bleeding profusely . . . people were pointing to him . . . saying that he had shot someone."

33

Defense counsel immediately objected to the testimony. And the court stated, "All right. The objection is sustained." The court then addressed counsel at sidebar and instructed the officer not to refer to defendant as a suspect and not to refer to Carrillo as the victim. The officer later identified defendant as the individual he had seen bleeding and explained he had transported defendant to the hospital for treatment of his injuries.

Defendant argues his rights to a fair trial, to confront witnesses against him, and to due process were violated because the judge allowed the testimony about the statements—that defendant had shot someone—that Officer Arthur had attributed to the individuals near the profusely bleeding defendant, and the court had not provided a curative instruction concerning the testimony.

The officer's fleeting comment about the statements he attributed to the unidentified individuals constituted inadmissible hearsay. We are unpersuaded by the State's claim the statements attributed to the individuals constituted admissible excited utterances under N.J.R.E. 803(c)(2). To establish the admissibility of an excited utterance, the proponent of the evidence must establish: "1) '[a] statement relating to a startling event or condition'; 2) 'made while the declarant was under the stress of excitement caused by the event or condition'; and 3) 'without opportunity to deliberate or fabricate.'" State ex rel.

J.A., 195 N.J. 324, 340 (2008) (alteration in original) (quoting N.J.R.E. 803(c)(2)).

The record did not support the admission of Officer Arthur's testimony about the statement attributed to the individuals standing near the bleeding defendant. The statements declared defendant had shot someone but the record is bereft of evidence that any of the unidentified individuals had witnessed the shooting or that their statements had been made in "under the stress of" the shooting. There is also no evidence demonstrating the declarants lacked an opportunity to "deliberate" prior to making the statements or "fabricate" the statements because, again, the record is devoid of any information concerning what, if anything, the declarants had seen or when they arrived at the location of the shooting. In sum, there is no foundation in the record supporting a finding the statements the officer attributed to the individuals constituted excited utterances permitting their admission under N.J.R.E. 803(c)(3) as excited utterances that defendant "had shot someone."

We agree with defendant's contention Officer Arthur's testimony about the statements, if admitted in evidence, would have violated his rights to confront witnesses against him. The United States Constitution and the New Jersey Constitution guarantee defendants the right to confront witnesses and to cross-

examine accusers. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; State v. Branch, 182 N.J. 338, 348 (2005). The Confrontation Clause reflects "a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination." J.A., 195 N.J. at 342. "Although the Sixth Amendment does not interdict all hearsay, it does prohibit the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony." Ibid. (emphasis in original).

In Crawford, the Supreme Court held that the Confrontation Clause bars from a criminal trial all "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53-54. "The threshold issue is . . . whether the proffered statement is 'testimonial.'" State v. Wilson, 227 N.J. 534, 545 (2017). The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" to trigger Confrontation Clause scrutiny, but held "it applie[d] at a minimum . . . to police interrogations." Crawford, 541 U.S. at 68.

Our Supreme Court has explained that "a declarant's narrative to a law enforcement officer about a crime, which once completed has ended any 'imminent danger' to the declarant or some other identifiable person, is

36

testimonial." J.A., 195 N.J. at 348 (quoting Davis v. Washington, 547 U.S. 813, 827-28 (2006)). That is precisely the situation here. As explained by Officer Arthur, the statements about which he testified were offered by individuals following the commission of a crime—the shooting—and there is no evidence the declarants were in imminent danger when they made them. For that reason alone, the purported statements were testimonial and, if admitted in evidence, would have violated defendant's confrontation rights. Ibid.

We reject defendant's argument that Officer Arthur's fleeting reference to the statements provides ground for reversal. The court promptly sustained the objection to the statements and, as such, correctly denied admission of the testimony about them in evidence. The court had informed the jury at the outset of the trial that if it sustained an objection to a question or testimony, that meant the court had ruled in favor of the attorney making the objection and the excluded evidence "is not evidence and must not be considered by [the jury] in [its] deliberations." We "must assume that the jury followed the instructions delivered by the trial court," State v. Marshall, 173 N.J. 343, 355 (2002), and discern no basis in the record supporting a contrary conclusion here.

Defendant contends the court erred by failing to provide a curative instruction, but he chose not to request one. "When no request for a limiting or

curative instruction is made, defendant must show that the failure to give such an instruction sua sponte constitutes an error 'clearly capable of producing an unjust result.'" State v. Mays, 321 N.J. Super. 552, 619 (App. Div. 1999) (quoting State v. Lofton, 287 N.J. Super. 76, 97 (App. Div. 1996)). Where, as here, defense counsel objected to the testimony but did not request a curative instruction, we may infer counsel "made a strategic decision not to draw more attention to [the] isolated, fleeting comment" and "[w]e owe some degree of deference to counsel's strategic or tactical decision[]" to not make the request. Id. at 633.

Based on the circumstances presented, we are persuaded the fleeting testimony the court excluded by sustaining counsel's objection is not clearly capable of producing an unjust result and infer that defense counsel made a strategic decision not to request a curative instruction to avoid highlighting the objectionable testimony. Moreover, we again note the evidence establishing defendant's guilt was otherwise substantial. Carrillo and Jackson identified defendant. There was gunshot residue found on defendant's sleeve. Defendant's DNA was found on the gun, and defendant was found by the police at the scene immediately following the shooting. Officer Arthur's brief testimony, which the

court properly excluded, was therefore not clearly capable of producing an unjust even in the absence of a curative instruction.

## IV.

Defendant further argues the prosecutor engaged in misconduct during opening and closing statements by mischaracterizing the evidence and by otherwise valorizing Carrillo by calling him a hero and his actions heroic. He claims the prosecutor's conduct deprived him of a fair trial and requires reversal of his convictions.

Defendant did not object to any of the prosecutor's comments about which he now complains. We therefore review the comments under the plain error standard. See State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001). "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Frost, 158 N.J. at 82. However, a prosecutor "must refrain from improper methods that result in a wrongful conviction." State v. Smith, 167 N.J. 158, 177 (2001).

Prosecutorial misconduct is grounds for reversal only if the conduct was so egregious that it deprived the defendant of a fair trial. Id. at 181. To deprive a defendant of a fair trial, the prosecutor's conduct "must have been 'clearly and

A-3437-21

unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Id. at 182 (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)).

We evaluate the challenged remarks in the context of the respective opening statement and summation as a whole, State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008), and the entire record, State v. Bey, 129 N.J. 557, 620 (1992). That is because "[n]ot every instance of misconduct in a prosecutor's summation will require a reversal of a conviction. There must be a palpable impact." State v. Swint, 328 N.J. Super. 236, 261 (App. Div. 2000). And, where there is no objection to a prosecutor's remarks or comments, "it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." Pressley, 232 N.J. at 594 (quoting State v. Echols, 199 N.J. 344, 360 (2009)).

Defendant claims the prosecutor engaged in misconduct by misstating the evidence concerning the DNA that had been recovered from the gun. During summation, the prosecutor stated that a detective had testified "he swabbed the trigger" of the gun when he had recovered the revolver. Defendant contends the statement was misleading because the detective had testified he swabbed the entire gun for DNA. The State contends the detective testified he had swabbed

the trigger as one part of the swabbing of the gun he had done and therefore the prosecutor's statement was accurate and proper.

We find nothing improper about the prosecutor's statement that the detective testified he had swabbed the trigger of gun. The detective testified he had swabbed the trigger, even though he also testified he had swabbed other parts of the gun—the entire gun—as well. The prosecutor did not, however, state the detective had swabbed only the trigger or that DNA from the trigger had matched defendant's DNA. And, as the court otherwise had instructed the jurors, it was their recollection of the testimony on which they were required to base their decision and not the evidence as argued by counsel.

Defendant similarly argues the prosecutor engaged in misconduct during summation by stating the State's DNA expert had testified there was a one-in-seven-trillion probability that the DNA recovered from the gun could be from someone other than defendant. We reject defendant's argument because the expert testified that the "World population is about [seven] billion, so that threshold is set at [seven] trillion. So statistically, we would need a population of a thousand earths to be able to expect to see this DNA profile to occur a second time." Thus, the prosecutor's statement that the evidence established a one-in-seven-trillion chance the recovered DNA came from someone other than

41

defendant did not constitute misconduct—the prosecutor's statement accurately reflected the expert's testimony.

Defendant argues the prosecutor misstated the expert's testimony concerning the one-in-seven-trillion probability by erroneously misapplying what defendant refers to as "random match probability." We reject the claim because the DNA expert did not testify concerning random match probability, the record is devoid of any evidence concerning it or supporting defendant's contention, and the prosecutor's statements concerning the probability the DNA found on the gun could have come from someone other than defendant constituted fair comment based on the expert's unrefuted testimony.

Defendant also contends the prosecutor misrepresented the DNA evidence during summation by stating that if the recovered DNA had come from someone related to defendant, the person would have to have been defendant's biological twin. Defendant claims the purported misrepresentation impaired the jury's ability to properly consider defendant's son, Rayquan Morton, as a possible contributor to the DNA found on the gun.

The argument fails because, contrary to defendant's contention, the DNA expert testified that "[n]o two people will have the exact same DNA, except for identical twins" and that the DNA recovered from the gun was defendant's. It

42

was not misconduct for the prosecutor to rely on that testimony in making his arguments in summation to the jury.

We agree with defendant that during his opening statement the prosecutor inappropriately identified Carrillo as a hero and as having acted heroically in stepping in front of defendant as he pointed the gun at Payne and by citing Carrillo's and Jackson's bravery during summation. The comments were inappropriate because they highlighted the victim's and witness's virtues and were inconsistent with the prosecutor's duty to confine arguments and comments before the jury to the evidence.

In any event, the challenged comments were fleeting and did not play a significant role in the prosecutor's comments during his opening or summation. The prosecutor's opening and closing remarks were otherwise properly focused on the evidence establishing defendant's guilt. Although we find those few comments were inappropriate, considering the context in which the statements were made and the entire trial record, we are convinced defendant has failed to demonstrate they were sufficiently prejudicial to have been clearly capable of producing an unjust result. See Smith, 167 N.J. at 181-82. The comments were not "so egregious that [they] deprived defendant of a fair trial," State v.

43

Wakefield, 190 N.J. 397, 446 (2007) (quoting Smith, 167 N.J. at 181), and they therefore do not permit or require reversal of defendant's convictions.

V.

Defendant also challenges his sentence. He argues the court erred by failing to merge his conviction for possession of a weapon for an unlawful purpose (count five) with his conviction for aggravated assault (count one), imposing a consecutive sentence on his possessory-weapons-offense convictions, and failing to properly find and weigh the aggravating and mitigating factors under N.J.S.A. 2C:44-1.

We apply a deferential standard to our review to the trial court's imposition of sentence, State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful we "should not 'substitute [our] judgment for those our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). We therefore will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

44

We first address issues related to the court's merger of the offenses for which the jury convicted defendant. Defendant argues the court erred by failing to merge his conviction for possession of a weapon for an unlawful purpose (count four) with his conviction for aggravated assault of Carrillo (count one). We find, and the State concedes, the court erred by failing to merge count four and count one because it is well-settled that "[w]hen the only unlawful purpose in possessing [a weapon] is to use it to commit the substantive offense," the possessory-weapons charge must merge with the substantive offense. State v. Tate, 216 N.J. 300, 312 (2013) (alteration in original) (quoting State v. Diaz, 144 N.J. 628, 636, 638-39 (1996)); see also State v. Abril, 444 N.J. Super. 553, 563-64 (App. Div. 2016).

That is the case here. As the State recognizes, the evidence established defendant's only unlawful purpose in possessing the handgun was to use it to shoot Carrillo and otherwise point it at Payne. Tate, 216 N.J. at 313; Abril, 444 N.J. Super. at 563-65; see also State v. Smith, 322 N.J. Super. 385, 400 (App. Div. 1999) (remanding for entry of a "corrected judgement" addressing the court's error in merging an unlawful-possession-of-a-weapon conviction with an

armed robbery conviction).[7]  And, as noted, the court had otherwise merged the aggravated-assault-by-pointing-the-handgun-at-Payne conviction under count three with the aggravated-assault-of-Carrillo conviction under count one.

Based on the merger decisions made by the sentencing court, as corrected in part in this decision, defendant should have been sentenced solely on count one, aggravated assault on Carrillo, and count eight, certain persons not to possess a weapon.  The court should not have sentenced defendant on count four, possession of a weapon for an unlawful purpose.

Defendant also challenges the court's weighing of the statutory aggravating and mitigating factors, see N.J.S.A. 2C:44-1(a) and (b), in its sentencing analysis.  As noted, we will "affirm a sentence unless . . . the

---

[7]  The State argues on appeal that the court also erred by merging defendant's convictions on count three, aggravated assault on Payne, with defendant's conviction on count one, aggravated assault on Carillo, and by merging count five, unlawful possession of a handgun, with count four, possession of a weapons for an unlawful purpose.  We do not address those contentions because they are not properly before us; the State opted not to cross-appeal from defendant's judgment of conviction.  State v. Elkwisni, 190 N.J. 169, 175 (2007).  We do not, however, preclude the State from raising the issues directly with the trial court on the resentencing that, as we explain, we otherwise order.  The court on remand shall address such arguments, if presented on remand, in accordance with the applicable law and rules.  Our decision permitting the State to make those arguments on remand shall not be construed as expressing on opinion on the merits of any such arguments presented.

aggravating and mitigating factors found by the sentencing court were not based on competent and credible evidence in the record." Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 364-65).

Defendant's claim the court's analysis of the aggravating and mitigating factors was comprised of a mere statement that it had assessed the factors is belied by the record. The court's discussion of defendant's extensive prior record supported its finding of aggravating factors three, the risk of reoffending, N.J.S.A. 2C:44-1(a)(3); six, the extent of defendant's prior criminal record, N.J.S.A. 2C:44-1(a)(6); and nine, the need for deterrence, seriousness of the offenses and need to deter, N.J.S.A. 2C:44-1(a)(9). More particularly, the court explained

> defendant has had prior contact with the court system. As a juvenile he had one adjudication and one violation of probation. As an adult, he's a multi-state offender, with one conviction in the First Judicial Court in Philadelphia. And in New Jersey the defendant has had six Municipal Court convictions, nine Superior Court convictions, including two for CDS . . . possession, distribution on or near school property. One for disarming a law enforcement officer; one for possession of CDS; two for aggravated assault; one for terroristic threats; two for resisting arrest; and one for possession with distribution within 500 feet of certain public property.

47

Defendant also argues the court should have found mitigating factor nine, that defendant's character and attitude make it unlikely that he will reoffend, N.J.S.A. 2C:44-1(b)(9). The court considered and properly rejected that factor, finding it undermined by substantial credible evidence establishing defendant's significant criminal history, which includes his prior commission of violent crimes.

Defendant also argues the court had inconsistently found both aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9), and mitigating factor eight, the circumstances leading to the charge are unlikely to reoccur, N.J.S.A. 2C:44-1(b)(8). Defendant claims that under similar circumstances the Court in Fuentes ordered a remand for resentencing because the trial court had failed to explain its reasoning for finding mitigating factor eight and aggravating factor nine. 217 N.J. at 80-81.

Contrary to defendant's contention, the Court in Fuentes explained that "[b]ecause N.J.S.A. 2C:44-1's statutory language does not suggest, and [the Court had] never held, that aggravating factor nine and mitigating factor eight are inherently incompatible," it "did not adopt such an inflexible rule." Id. at 79. As the Court explained, "even if the record demonstrates that the offense at issue arose in circumstances unlikely to recur, thus supporting a finding as to

48

mitigating factor eight, a defendant could nonetheless pose a risk of recidivism, requiring specific deterrence within the meaning of N.J.S.A. 2C:44-1(a)(9)." Id. at 80. That is the precise determination the sentencing court made here, and we find no error in the court's conclusion because it is supported by substantial credible evidence.

We therefore find no basis in the record to question or disturb the court detailed, thoughtful, and well-supported findings of the aggravating and mitigating factors. Our review of the record similarly reveals no grounds to disturb the court's weighing of the factors in its determination of defendant's sentence. We reject defendant's claims to the contrary.

As we have explained, the court sentenced defendant to concurrent eight-year custodial terms on counts four and eight and a consecutive eight-year term on count one.[8] Defendant argues the court erred by imposing consecutive sentences on the possessory weapons offenses and the aggravated assault for which he was convicted because "the offenses were part and parcel of the same incident." He also contends the court erred by imposing the consecutive

---

[8] As noted, we have vacated the court's sentence on court four because the court should have merged that count with count one.

sentences, claiming the court misapplied the principles governing the imposition of consecutive sentences established in State v. Yarbough, 100 N.J. 627 (1985).

In Yarbough, the Court "identified a series of factors for sentencing courts to consider as a guide in determining whether to make sentences run concurrently or consecutively." State v. Torres, 246 N.J. 246, 264 (2021). The Court has explained that a proper analysis under Yarbough "does not rely on ticking off the . . . factors." Id. at 270. "[A] sentencing court's decision whether to impose consecutive sentences should retain focus on 'the fairness of the overall sentence.'" Id. at 270 (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

In support of its imposition of the consecutive sentences, the court generally addressed the Yarbough factors.[9] The court found that the possessory-

---

[9] The Yarbough factors include:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
> (a) the crimes and their objectives were predominantly independent of each other;
> (b) the crimes involved separate acts of violence or threats of violence;

weapons offenses for which defendant was convicted under counts four and eight "stand separately and alone" from the aggravated assault under count one and "would have merited a conviction even if the aggravated assault had not occurred." That finding adds little substance to the analysis of whether to impose a consecutive sentence because a court may consider imposing a consecutive sentence only where a defendant has been convicted of more than

> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
> (d) any of the crimes involved multiple victims;
> (e) the convictions for which the sentences are to be imposed are numerous;
> (4) there should be no double counting of aggravating factors; [and]
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]
>
> [Yarbough, 100 N.J. at 643-45.]

The Yarbough factors as first explained by the Court included a sixth factor— "there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses"—that was "disapproved by the Legislature[,]" when in 1993 it "amended N.J.S.A. 2C:44-5(a) to clarify that '[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses.'" Torres, 246 N.J. at 265 (alteration in original) (citation omitted).

one separate offense, and the commission of separate crimes alone does not warrant the imposition of consecutive sentences. See id. at 266 (explaining our Criminal "Code does not contain a presumption in favor of either concurrent or consecutive sentences"). If it were otherwise, it would be unnecessary to consider the Yarbough factors and the overall fairness of a sentence in determining whether to impose a consecutive sentence. See generally id. at 262-68.

The court also based its decision to impose consecutive sentences on its finding that defendant's "possession of the gun preceded the shooting, and while somewhat overlapping," his possession of the gun was "materially separate in time and location" from the shooting. Based on those findings, the court determined defendant's sentence on the aggravated assault under count one should run consecutive to the concurrent sentences it had imposed on the possessory-weapons offenses under counts four and eight because "the gun charges involved unique periods and locations of illegal behavior" and therefore "did not constitute a single period of aberrant behavior." The court further reasoned that "[b]ecause of the distinct nature of the crimes," imposition of consecutive sentences would "uphold the principle that there . . . should be no free crimes."

In our view, those findings are in part based on the same error that caused the court's incorrect failure to merge count four with count one. Again, as the State concedes, it was necessary to merge count four with count one because the evidence established defendant possessed the handgun solely for the unlawful purpose of pointing it at Payne and shooting Carrillo. As such, the commission of the possession-of-a-weapon-for-an-unlawful-offense under count four occurred at the identical location as, and simultaneous with, the commission of the aggravated assaults for which he was convicted. The commission of the crime for which defendant was convicted under count four was therefore clearly part of the same period of aberrant behavior. The court's contrary finding finds no support in the record.

We recognize defendant was also convicted of certain persons not to possess a weapon under count eight, and that is an offense distinct from the possession-of-a-weapon-for-an-unlawful-purpose offense under count four. But the court did not offer reasons for the imposition of a consecutive sentence on count eight different from those on which it relied in imposing a consecutive sentence on court four. And, as we have explained, those reasons are not supported by the record. Moreover, the court's finding that consecutive sentences are appropriate because the offenses occurred at different times and

53

at different locations is simply inaccurate—the evidence showed defendant possessed the handgun at only a single instant in time and at a single location—and that is when he pointed the gun at Payne and fired it at Carrillo.

There may be grounds in the record to support the imposition of a consecutive sentence on defendant's certain-persons conviction but for the reasons we have explained, the court's findings supporting its consecutive-sentence determination are incorrect, contradicted by the record, and inadequate to support its imposition of a consecutive term.

It is also unclear if the court deemed a consecutive sentence was warranted because it sentenced defendant on two weapons offenses, instead of the only offense—count eight—for which it should have sentenced defendant based on a proper application of merger principles, or if the court's determination of the overall fairness of the sentence was affected by its erroneous understanding it was required to impose sentence on three separate convictions—the two weapons offenses and single aggravated assault following merger—when, due to merger, it was required to sentence defendant on only two separate offenses—counts four and eight.

For those reasons, we deem it appropriate to vacate defendant's sentences to allow the court to consider anew its imposition of its sentences on counts one

and eight, as well as whether the sentences should be consecutive, in the absence of its mistaken understanding that it was also required to sentence defendant on count four. In remanding the matter for resentencing on counts one and eight, we do not offer any opinion on the terms of the sentences that should be imposed or whether consecutive or concurrent sentences should be imposed. That decision shall be made by the remand court in accordance with all applicable legal principles based on the record presented and the arguments of counsel. See generally State v. Randolph, 201 N.J. 330 (2012).

To the extent we have not expressly addressed any of defendant's arguments, including his contention that purported cumulative errors require reversal of his convictions and sentence, we have determined they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

We affirm defendant's convictions, vacate his sentence, and remand for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION